**FREETHOUGHT SOCIETY et al.**

v.

**CHESTER COUNTY et al.**

No. Civ.A.01–5244.

United States District Court,
E.D. Pennsylvania.

March 6, 2002.

Stefan Presser, American Civil Liberties Union, Philadelphia, PA, for Plaintiffs.

Thomas C. Abrahamsen, Solicitor's Office, West Chester, PA, for Defendants.

## MEMORANDUM

DALZELL, District Judge.

Before us is plaintiffs' request for a permanent injunction against the authorities of Chester County, Pennsylvania, from maintaining a plaque on the County Courthouse that displays the full text of the King James Version of the Ten Commandments.

To consider this vexing question under the First Amendment's Establishment Clause ("Congress shall make no law respecting an establishment of religion"), we held a non-jury trial on March 4—5, 2002. This Memorandum will constitute our findings of fact and conclusions of law, in accordance with Fed.R.Civ.P. 52(a).

*Factual Background*

The genesis of this particular Ten Commandments plaque is not in serious dispute.

On March 1, 1920, the Chester County Commissioners authorized the county's acceptance of a gift of the plaque from the Council of Religious Education of the Federated Churches of West Chester. All known members of the Council at the time were clergy or laymen of mainline Protestant denominations. On November 8 of that year, the County Commissioners specified the placement of the plaque on the east front of the High Street side of the Chester County Courthouse, where it remains to this day in the Borough of West Chester. On December 6, 1920, the County Commissioners authorized their Solicitor, Mr. MacElree, to be present at the unveiling of the tablet on Saturday, December 11, and he accepted the plaque on the county's behalf.

The dedication was held in Courtroom 2 of the County Courthouse. The program of that dedication, received in evidence at trial, was stipulated to be authentic and records that the ceremony was presided over by the Rev. Mr. Samuel C. Hodge, Chairman of the Council. It opened with an invocation that the Rev. Mr. Jay Dickerson, Pastor of the Methodist Episcopal Church, led. Those present then sang the hymn, "Before Jehovah's Awful Throne." After two speeches, including one by a Common Pleas Court Judge, the plaque was unveiled. The program records that all were then called upon to recite antiphonally a prayer of dedication that the Rev. Mr. Charles R. Williamson led:

Leader: *Because* we believe that the Ten Commandments are basic to righteousness and justice in government, industry, commerce, the administration of law, and in society.

Response: *We Dedicate* to God this tablet of the Ten Commandments.

Leader: *Because* we believe that the presence of these inscriptions in bronze of the Ten Commandments will be a reminder, to all who read as they pass by, of their duty and responsibility to God and their fellow men.

Response: *We Solemnly Dedicate* to the cause of public morality this tablet of the Ten Commandments.

Leader: *Because* we believe that the presence of this tablet on this temple, dedicated to justice and the cause of human rights, will be an inspiration to righteous living on the part of our youth and children.

Response: *We Joyfully Dedicate* to the interests of a better generation of citizens and a better nation this tablet.

All:    *All Of Which We Do* in holy fear of Him who is Ruler over all and the Father of us all.
    Amen!    Amen!    and Amen!

*See* Pl'ffs.' Ex. 11. After the congregation sang "My Country, 'Tis of Thee' ", the Rev. Mr. Charles A. Walker gave the closing Benediction. *Id.*

According to contemporary newspaper accounts, the keynote speaker, Judge J. Frank E. Hause, decried lax Sabbath observance with the words, "Have you remembered the Sabbath Day to keep it holy? If you disobey the commandments here and escape punishment, there is yet the punishment which will surely be meted out on the day of judgment." [1]

The Ten Commandments plaque is fifty inches tall and thirty-nine inches wide and has, as noted, remained at the same location on the Courthouse's High Street facade since its dedication in 1920. When one faces the east side of the Courthouse, and looks through the six Corinthian pillars a few feet in front of that facade, the Ten Commandments plaque stands out against the white stone blocks it is mounted on. To its north there are two small signs saying "No Smoking Building" and identifying the structure as historically significant. Nevertheless, as defendants' Ex. 29 shows, the Ten Commandments tablet dominates the left or south side of the High Street facade. On the right, north side of the door, there are signs identifying the building, giving its business hours, and directing people to after-hours access; there is also a small plaque confirming that the building is registered on the National Register of Historic Places. There is thus no other tablet on the High Street facade of any substantive historical, political or philosophical content.[2]

The English text of the Ten Commandments is taken from the version King James commissioned in 1603, known to scholars as the Authorized Version. The tablet takes its text from that translation of Exodus 20: 2–17 and Deuteronomy 5: 6–21, with the Summary from Matthew 22:37 and 39, which are Jesus' words bringing together Deut. 6:5 and Lev. 19:18. The tablet's exact words, paragraphing, and relative font size, follow:

## THE COMMANDMENTS

THOU SHALT HAVE NO OTHER GODS BEFORE ME.
THOU SHALT NOT MAKE UNTO THEE ANY GRAVEN IMAGE, OR ANY LIKENESS OF ANY THING THAT IS IN HEAVEN ABOVE, OR THAT IS IN THE EARTH BENEATH, OR THAT IS IN THE WATER UNDER THE EARTH:
THOU SHALT NOT BOW DOWN THYSELF TO THEM NOR SERVE THEM:
FOR I THE LORD THY GOD AM A JEALOUS GOD, VISITING THE INIQUITY OF THE FATHERS UPON THE CHILDREN UNTO THE THIRD AND FOURTH GENERATION OF THEM THAT HATE ME. AND SHOWING MERCY UNTO THOUSANDS OF THEM THAT LOVE ME AND KEEP MY COMMANDMENTS.

1. *Daily Local News,* December 13, 1920, which we received as an ancient document as Pl'ffs.' Ex. 12, at p. 2. *See* Fed.R.Evid. 901(b)(8); *United States v. Szehinskyj,* 104 F.Supp.2d 480, 488–89 (E.D.Pa.2000), *aff'd* 277 F.3d 331 (3d Cir.2002).

2. To be sure, on the inside of the building there are framed copies of, for example, the Declaration of Independence, but nothing of that kind appears on any plaque on the outside of the building. It is therefore fair to say that the Ten Commandments tablet is unique on the building's facade.

THOU SHALT NOT TAKE THE NAME OF THE LORD THY GOD IN VAIN:

FOR THE LORD WILL NOT HOLD HIM GUILTLESS THAT TAKETH HIS NAME IN VAIN.

REMEMBER THE SABBATH DAY, TO KEEP IT HOLY.
SIX DAYS SHALT THOU LABOR AND DO ALL THY WORK:
BUT THE SEVENTH DAY IS THE SABBATH OF THE LORD THY GOD: IN IT THOU SHALT NOT DO ANY WORK, THOU, NOR THY SON, NOR THY DAUGHTER, THY MANSERVANT, NOR THY MAIDENSERVANT, NOR THY CATTLE, NOR THY STRANGER THAT IS WITHIN THY GATES:

FOR IN SIX DAYS THE LORD MADE HEAVEN AND EARTH, THE SEA, AND ALL THAT IN THEM IS, AND RESTED THE SEVENTH DAY, WHEREFORE THE LORD BLESSED THE SABBATH DAY, AND HALLOWED IT.

HONOR THY FATHER AND THY MOTHER;

THAT THY DAYS MAY BE LONG UPON THE LAND WHICH THE LORD THY GOD GIVETH THEE

THOU SHALT NOT KILL.
THOU SHALT NOT COMMIT ADULTERY.
THOU SHALT NOT STEAL.
THOU SHALT NOT BEAR FALSE WITNESS AGAINST THY NEIGHBOUR.
THOU SHALT NOT COVET THY NEIGHBOUR'S HOUSE.
THOU SHALT NOT COVET THY NEIGHBOUR'S WIFE, NOR HIS MANSERVANT, NOR HIS MAIDENSERVANT, NOR HIS OX, NOR HIS ASS, NOR ANY THING THAT IS THY NEIGHBOUR'S.

---

SUMMARY

THOU SHALT LOVE THE LORD THY GOD WITH ALL THINE HEART, AND WITH ALL THY SOUL AND WITH ALL THY MIND.
THOU SHALT LOVE THY NEIGHBOR AS THYSELF.

The Chester County Courthouse today houses many public offices. In addition to the offices of the three County Commissioners, it also has those of the County Treasurer, Controller, District Attorney, Public Defender, Sheriff, Prothonotary, Clerk of Court, Register of Wills, Court of Common Pleas, Adult Probation and Solicitor. It is undisputed that, as a result of the presence of these public offices, residents of Chester County go to the Courthouse to secure legal documents such as passports and licenses for marriage, hunting, and dogs, as well as permits for guns. The Courthouse itself is an elegant Greek Revival building, erected in 1846, that has been listed for many years in the National Register of Historic Places.

Plaintiff Sally Flynn has been a resident of Chester County since August of 1960. She first observed the Ten Commandments plaque when she attempted to get a license for her dog in August of 1960. She has since been called three times as a juror and testified once as a victim-witness in the Courthouse. Though at the time she moved to the county she was not affiliated with any church, Ms. Flynn dates her decision to become an atheist as around 1996. She is also a member of plaintiff Freethought Society of Greater Philadelphia, which is composed of like-minded atheists and freethinkers, including several other members from Chester County.

*Legal Analysis* [3]

---

**3.** Our federal question jurisdiction is founded upon the constitutional claims raised in this 42 U.S.C. § 1983 action.

## A. *Standing*

■ There seems to be little question that plaintiff Sally Flynn has "suffered an injury in fact" within the meaning of *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). That is to say, her injury is "concrete and particularized", and "actual" and "not conjectural or hypothetical" because she has for forty years lived in Chester County and must go to the courthouse building for matters as mundane as getting a dog license (as she has done) or as important as serving as a juror or witness (as she has repeatedly done). She is a frequent visitor to the High Street side of the building to support rallies of the Democratic Party and of pro-choice adherents. It is undisputed that she is an atheist. She finds the tablet unwelcome every time she passes it by, and has often taken steps to avoid seeing it. It is therefore unsurprising that the Seventh Circuit in *Books v. City of Elkhart, Indiana*, 235 F.3d 292, 300–01 (7th Cir.2000), *cert. denied*, 532 U.S. 1058, 121 S.Ct. 2209, 149 L.Ed.2d 1036 (2001) held that one in Ms. Flynn's position had standing to challenge a Ten Commandments tablet on public grounds.

*American Civil Liberties Union of New Jersey v. Township of Wall*, 246 F.3d 258 (3d Cir.2001), is not to the contrary. Our Court of Appeals there cited and quoted, without criticism, other circuit authority finding standing where a plaintiff had "direct, personal contact" with an offending religious display. *See id.* at 266, *citing and quoting e.g., Foremaster v. City of St. George*, 1490–91 (10th Cir.1989) and *Saladin v. City of Milledgeville*, 812 F.2d 687, 692–93 (11th Cir.1987). Because there was no testimony in *Wall* regarding plaintiffs' reaction to a new Christmas display that superseded an old one, the court held that they lacked standing, *id.* at 266, an impediment not present here because Ms. Flynn, for example, is regularly in or very near the Courthouse.

■ As an organization with members like Ms. Flynn from Chester County, the Freethought Society also has associational standing under *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The Freethought Society has fifteen members from West Chester, and most of its members are either atheists or self-described "free-thinkers". Other members, such as the organization's founder, Margaret Downey, have also had unwelcome contact with the Ten Commandments plaque. The Freethought Society of Greater Philadelphia therefore has standing to pursue this case.

■ Our conclusion that both Ms. Flynn and the Freethought Society have standing is not undermined by the recent development that the High Street door closed to the public in September of 2001. It is undisputed that the High Street approach to the Courthouse is still open, and its plaza indeed remains the locus for public demonstrations of, for example, the Democratic Party of Chester County and, on an annual basis, for both protesters and supporters of the Supreme Court's decision in *Roe v. Wade*. Ms. Flynn reported that she is a regular attender of Democratic Party rallies. She also participates in counterprotests in January of each year as a supporter of the Supreme Court's decision in *Roe*, and did so on *Roe's* anniversary this year.

As to Ms. Downey as the Freethought Society's representative, she testified that, as a licensed "secular humanist celebrant", she must go to the Courthouse to obtain a special license to solemnize marriages. As recently as December, 2001, she waited on High Street, in sight of the plaque, to meet a West Virginia couple to obtain the requisite license. As a secular humanist celebrant, she will need to return to the Courthouse on a regular basis. The

Freethought Society's standing is therefore unimpaired by the closing of the High Street door.

Even defendants' witnesses agreed that passers-by could read "The Commandments" from the High Street sidewalk, and could readily walk up the steps and stand on the portico to read the plaque's full text. Ms. Downey testified that during just twenty minutes waiting for her clients in December of 2001, she saw a dozen people walk up to the now-closed door, just to the north of the tablet. Indeed, the fact remains that, as County Commissioner Hanna testified, a quarter million members of the public visit the Courthouse each year. Among those visitors are regulars Ms. Flynn and Ms. Downey, and they thus continue to have the requisite standing to challenge the tablet on the Courthouse.

### B. *The Merits*

The Supreme Court's landmark decision *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105 (1971) governs this case.

We recognize that the preceding sentence makes a controversial statement. At least four sitting justices of the Supreme Court have criticized *Lemon* in recent years. In order of seniority, the Chief Justice wrote cooly about *Lemon* in *Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 319, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (Rehnquist, C.J., dissenting) (*"Lemon* has had a checkered career in the decisional law of this Court."). Justice Stevens expressed his reservations when he stated his desire to avoid "continuing with the sisyphean task of trying to patch together the 'blurred, indistinct and variable barrier' described in *Lemon*" in his dissent in *Committee for Pub. Educ. & Religious Liberty v. Regan,* 444 U.S. 646, 671, 100

S.Ct. 840, 63 L.Ed.2d 94 (1980) (Stevens, J., dissenting). Justice Kennedy in *County of Allegheny, et al. v. American Civil Liberties Union Greater Pittsburgh Chapter, et al.,* 492 U.S. 573, 655–57, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (concurring in the judgment in part and dissenting in part) stated that, although *Lemon* had utility in judging holiday display cases, he did "not wish to be seen as advocating, let alone adopting, that test as our primary guide in this difficult area."

No justice, however, has heaped more ashes on *Lemon* than Justice Scalia did in his concurrence in *Lamb's Chapel v. Center Moriches School Dist.,* 508 U.S. 384, 398, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). Using an extended metaphor from the cinema, he wrote:

> As to the Court's invocation of the *Lemon* test: Like some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried, *Lemon* stalks our Establishment Clause jurisprudence once again, frightening the little children and school attorneys of Center Moriches Union Free School District. Its most recent burial, only last Term, was, to be sure, not fully six feet under: Our decision in *Lee v. Weisman,* 505 U.S. 577, 586–587, 112 S.Ct. 2649, 2654, 120 L.Ed.2d 467 (1992), conspicuously avoided using the supposed "test" but also declined the invitation to repudiate it. Over the years, however, no fewer than five of the currently sitting Justices have, in their own opinions, personally driven pencils through the creature's heart (the author of today's opinion repeatedly [Justice White] ), and a sixth has joined an opinion doing so.[4]

---

**4.** Justice Scalia's citations for this canvass include multiple opinions of Justice White, *e.g., School Dist. of Grand Rapids v. Ball,* 473

U.S. 373, 400, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985) (White, J., dissenting), then-Justice Rehnquist's and Justice Kennedy's opinions

As Justice Scalia noted in his *Lamb's Chapel* concurrence, there is also a "long list of constitutional scholars who have criticized *Lemon* and bemoaned the strange Establishment Clause geometry of crooked lines and wavering shapes its intermittent use has produced." *Id.* at 399, 113 S.Ct. 2141, *citing, e.g.,* Michael W. McConnell, *Accommodation of Religion,* 1985 S.Ct. Rev. 1; Philip B. Kurland, *The Religion Clauses and the Burger Court,* 34 Cath. U.L.Rev. 1 (1984).

This criticism continues with respect to the very issue involved in this case. When the Supreme Court denied the petition for a writ of *certiorari* to the United States Court of Appeals for the Seventh Circuit's decision in *Books v. City of Elkhart, supra,* cert denied, 121 S.Ct. 2209 (2001), the Chief Justice and Justices Scalia and Thomas dissented, and criticized the Seventh Circuit for "applying the oft-criticized framework set out in *Lemon v. Kurtzman*", *id.* at 2211.

Thus, among *Lemon*'s critics are at least five sitting Justices of the Supreme Court: The Chief Justice and Justices Stevens, Scalia, Kennedy and Thomas. But, as Judge Ripple stated for himself and Judge Williams in *Books,* "[w]e are obliged by the doctrines of stare decisis and precedent to employ [*Lemon*'s] methodology unless instructed otherwise by the Supreme Court." *Books, supra,* 235 F.3d at 301. With deference to the eminence of *Lemon*'s many critics, we therefore must still follow *Lemon* here.

Applying *Lemon*'s three-part analysis, we must examine (1) whether the governmental activity in question has a secular purpose, (2) whether its primary effect advances or inhibits religion and (3) whether it fosters an excessive entanglement with religion, *see Lemon,* 403 U.S. at 612–13, 91 S.Ct. 2105. Plaintiffs ask that we focus our attention on the first two issues, and argue that in doing so we need not consider the third.

### 1. *Purpose*

■ Notwithstanding the documentary record discussed at length above, defendants here profess not to know their predecessors' precise purpose in accepting the tablet from the Council of Religious Education of the Federated Churches of West Chester. But even if we were bereft of documents from 1920, the best place to discern that purpose would be from the tablet itself.

We first observe that the text's first 220 words are exclusively religious. That is to say, the first Commandment that recites what can fairly be construed as a purely moral value is "Honor thy father and thy mother." The same non-religious reading is possible and fair for the 70 words that follow that Commandment up to, but not including, the "Summary" from the Gospel According to Matthew. With the exception of "Thou shalt love thy neighbour as thyself", the other two lines of the Summary are purely theistic. Thus, discerning the "purpose" from the face of the tablet, no less than 241 words are explicitly religious, while only 84 could be fairly regarded as conveying a secular, moral message.

We are by no means the first to notice the predominant religious purpose of the Ten Commandments in any translation. In response to a statutorily mandated disclaimer on required public classroom displays of the Ten Commandments—"The secular application of the Ten Commandments is clearly seen in its adoption as the

quoted above in the text, Justice Thomas joining Justice Scalia in *Lee v. Weisman, supra,* 505 U.S. at 644, 112 S.Ct. 2649, and Justice O'Connor in *Corporation of Presiding Bishop* of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 346–49, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) (O'Connor, J., concurring in judgment).

fundamental legal code of Western Civilization and the Common Law of the United States"—the Supreme Court in *Stone v. Graham*, 449 U.S. 39, 41–42, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), wrote:

> The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact. The Commandments do not confine themselves to arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness. See Exodus 20: 12–17; Deuteronomy 5: 16–21. Rather, the first part of the Commandments concerns the religious duties of believers: worshiping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day. See Exodus 20: 1–11; Deuteronomy 5: 6–15.

That the tablet's translation is from the King James Version[5] also distinguishes it from, for example, that which the Seventh Circuit considered in Elkhart, Indiana in *Books*. In that case, the text was "an amalgamation of Jewish, Protestant and Catholic versions of the Ten Commandments". *Books*, 235 F.3d at 296. This distinction is hardly of only philological interest, as, for example, whether the Hebrew word should be translated as "kill" or "murder". In 2002, it is easy to forget that people were once executed for championing the wrong text of the Bible. William Tyndale, who gave us the translation that served as "the foundation of subsequent English versions" including the King James Version,[6] paid for his labors by being "strangled and burnt at the stake."[7] Less dramatically, it is within this Court's memory that, when the Lord's Prayer was a fixture in public school opening exercises in the era before *Schempp*,[8] Catholic children would either not recite the Lord's Prayer or stop reciting it after "deliver us from evil" as the Protestant children continued with "for thine is the power and the glory...."[9] Jewish children awkwardly remained silent.

With respect to the "Summary", it is, as noted, Jesus' conflation at Matthew 22:37–40 of Deuteronomy 6:5 and Leviticus 19:18. Since the Summary follows the Command-

---

**5.** This Version was authorized for use in English churches in 1611 (hence, "Authorized Version") and "within a generation displaced all previous versions, and has become the only familiar, and in most cases the only known, form of the Bible to generations of English-speaking people." *Oxford Dict. of the Christian Church*, "Bible (English Version)" at 169 (F.L. Cross ed.1958) (hereinafter "*ODCC*").

**6.** Preface, *The Oxford Annotated Bible With the Apocrypha*, p. ix (May & Metzger ed.1965) (hereinafter "*Oxford Bible*").

**7.** *ODCC*, "Tyndale, William" at 1382. Tyndale was executed in 1536 in Belgium where he had lived in exile from England. *Id. See also* David Daniell, *William Tyndale* 374–84 (1994).

**8.** *Sch. Dist. of Abington Township v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (holding that state-mandated prayer and devotional Bible reading in public schools are unconstitutional under the Establishment Clause).

**9.** The Lord's Prayer, taken from Matt. 6, at verse 13 in the King James Version adds, after "deliver us from evil", "For thine is the kingdom, and the power, and the glory, for ever. Amen." Protestant churches in the main have followed the King James approach, while Roman Catholics, whose translations typically derive from St. Jerome's Vulgate, do not. Scholars on the whole are of the view that the postscript words are "a doxology added in later MSS to round the prayer out liturgically." Samuel E. Johnson, 7 *Interpreter's Bible* 315 (1951). The Revised Standard Version takes the prevailing scholarly view. *See Oxford Bible* Matt. 6:13.

ments' complete text, it would seem a gratuitous addition to the tablet. But we can hardly fail to notice that it echoes the "Summary of the Law" familiar to all Episcopalians raised on *The Book of Common Prayer*.[10] Given the mainline Protestant parentage of the tablet, such a source cannot be ruled out.[11]

Chester County's history of receiving of this plaque demonstrates that it was "abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters" when it accepted the gift in 1920. *Corporation of the Presiding Bishop v. Amos*, 483 U.S. 327, 335, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). As noted earlier, the County received the plaque from a religious organization, the Council of Religious Education of the Federated Churches of West Chester, which seems from the record left us to have been a group of mainline Protestant churches that promoted Bible study and religious education. *See* Pl'ffs.' Exs. 4–6.[12] The program of the December 11, 1920 ceremony dedicating the plaque, quoted at length above, confirms the marriage of

Church and County that took place that day.[13]

Notwithstanding the tablet's language and local history, the current County Commissioners defend its continued display by stressing what they regard as the dual nature of the Ten Commandments today. Specifically, we heard the testimony of Commissioners Andrew Dinniman and Colin Hanna, two serious, reflective public officials who plainly did not lightly come to their conclusions. As a Jew, Commissioner Dinniman stated that he has never been offended by the plaque or the Summary, but rather finds the text to be "an affirmation of the [Jewish] faith" and an important part of our common Western tradition. He stressed that the Commandments "symbolize civilization" and that their placement on a courthouse building provides the requisite secular context to justify their continued display.

Commissioner Hanna defended the plaque with a thoughtful discussion of Michael Novak's recent book, *On Two Wings: Humble Faith and Common Sense at the*

---

**10.** The language in the Holy Communion service in both the 1892 and 1928 editions of *The Book of Common Prayer* was:

> Hear also what our Lord Jesus Christ saith. Thou shalt love the Lord thy God with all thy heart, and with all thy soul, and with all they mind: This is the first and great commandment. And the second is like unto it: Thou shalt love thy neighbour as thyself. On these two commandments hang all the law and the prophets.

*See The Book of Common Prayer* 218 (Annotated ed., Philadelphia 1895). *See also The Book of Common Prayer* 169 (1928).

**11.** Defendants' expert, Dr. Peter Alan Lillback, agreed with us in his testimony that this source was a realistic possibility.

**12.** Plaintiffs' Ex. 4, for example, a newspaper article from the November 25, 1919 *Daily Local News*, identifies the Rev. Samuel C. Hodge, who presided over the December 11, 1920 ceremony, as pastor of the First Presby-

terian Church, and Prof. S.L. Kreemer, who presented the plaque at the ceremony, as "teacher of the Kreemer Bible Class of the Methodist Episcopal Sunday School." They were identified in that news account as temporary Chairman and Vice–Chairman of the then-newly founded Council.

**13.** Contrast the pious genesis of this plaque with that of the Ten Commandment monuments in Elkhart, Indiana in *Books* and in Denver in *Freedom From Religion Foundation*, cited and discussed *infra*, where a force behind the monuments was none other than Cecil B. DeMille, whose motive we suspect had more than a little to do with the film he ultimately produced in 1956 that garnered a Best Picture nomination. The Colorado Supreme Court entertained "no doubt" that DeMille's active participation—rather as a kind of Johnny Appleseed of Ten Commandments monuments—was to promote *The Ten Commandments*. *See* 898 P.2d 1013, 1017 (Colo. 1995).

*American Founding*, that was just published in December of 2001. As Commissioner Hanna pointed out, the "two wings" refer to faith and ,reason, and both as a historical reality worked together to create and maintain the American experiment. The Commissioner regards the plaque as but one example of Novak's two wing theory of our polity.

Interesting and sensitive as the Commissioners' observations are, they nevertheless cannot negate the plain words of the tablet, which by a ratio of almost three to one convey a religious message. Similarly, their views do not change the fact that the County has done nothing since 1920 to change the prominence and uniqueness of this large religious plaque on the High Street facade. Lastly, the views of current officeholders are of little, if any, value in determining the purpose at the time of the pertinent government action, which here was in 1920.[14]

Thus, both on the face of the tablet and with reference to its history, we conclude that the purpose of the plaque is primarily religious and only incidentally secular.

### 2. *Effect*

■ In the years after *Lemon*, the Supreme Court has read the decision's second prong—whether the questioned government activity's "principal or primary effect [is] one that neither advances nor inhibits religion", *Lemon*, 403 U.S. at 612, 91 S.Ct. 2105—as, in the words of Justice O'Connor, "whether an objective observer . . . would perceive it as a state endorsement of [religion]." *Wallace v. Jaffree*, 472 U.S. 38, 76, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring).[15] *See also County of Allegheny v. Am. Civ. Lib. Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 593, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) ("the term 'endorsement' is closely linked to the term 'promotion' and this Court long since has held that government 'may not . . . promote one religion or religious theory against another' ").

With this legal background in mind, the fact that the tablet hangs alone is of great constitutional moment. It readily distinguishes it from, for example, the tablet in Denver that (barely) passed constitutional muster seven years ago in the Colorado Supreme Court. *See State of Colorado v. Freedom From Religion Foundation*, 898 P.2d 1013 (Colo.1995), which defendants' counsel in closing argument called his "best case".

In *Freedom From Religion Foundation*, the Ten Commandments monument, which was located on state property, was installed at the behest of the Youth Guidance Committee of the Fraternal Order of Eagles, whose guiding light and chief cheerleader was, as noted, Cecil B. DeMille.

---

**14.** *See Edwards v. Aguillard*, 482 U.S. 578, 585–96, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); *Wallace v. Jaffree*, 472 U.S. 38, 56–61, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); *Books, supra*, 235 F.3d at 303.

**15.** Justice O'Connor's reference to the "objective observer" brought immediate scholarly criticism of its circularity. As Professor McConnell put it:

> Nor is Justice O'Connor's notion of the "objective observer" likely to prove illuminating. Whether an observer would "perceive" an accommodation as "endorsement of a particular religious belief" depends entirely on the observer's view of the proper relation between church and state. . . . Looking to an "objective observer" cannot substitute for a constitutional standard. Such a formulation serves merely to avoid stating what considerations inform the judgment that a statute is constitutional or unconstitutional. If Justice O'Connor's "objective observer" standard were adopted by the courts, we would know nothing more than that judges will decide cases the way they think they should be decided.

McConnell, *supra*, 1985 S.Ct. Rev. at 48 (footnote omitted).

*See id.* at 1017 and note 13, *supra.* The granite monument was one of many memorials in a one square block park in Denver. It stood, for example, under taller statues that honored an Hispanic Congressional Medal of Honor recipient, as well as a Veterans War Memorial and a statue of a Native American and a buffalo. As the Court's Majority pointed out, "In fact, the Ten Commandments monument is one of the smallest and least conspicuous of the displays in Lincoln Park." *Id.* at 1025. Accordingly, as one of many memorials in the state park, it was one of a "collection of monuments [that] celebrates a history of standing up against oppression, foreign and domestic, and an acknowledgment of the cultural tapestry that is Colorado." *Id.* The Court therefore found that "the content and context of the monument negate any suggestion that the government is endorsing religion" and that "objective viewers would not perceive the monument . . . as government endorsing religious belief or suggesting that religion in general is relevant to their standing in the political community." *Id.* at 1025–26. Three of the seven Colorado Supreme Court justices dissented.

The situation here bears no resemblance to the public park in Denver. Other than much smaller, simple directional or informational plaques, this one hangs by itself. The only plaque on the Courthouse facade with any substantive content is the Ten Commandments tablet. With neither (say) the Bill of Rights, the Declaration of Inde-

pendence, the Mayflower Compact nor any other fundamental legal text flanking it, the tablet's necessary effect on those who see it is to endorse or advance the unique importance of this predominantly religious text for mainline Protestantism.[16] Such "denominational preference" runs afoul of settled Supreme Court Establishment Clause jurisprudence. *Larson v. Valente,* 456 U.S. 228, 244–46, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982).

Having failed *Lemon's* first two prongs, we need not pass to the question of "entanglement", whatever that may mean outside the educational sphere that spawned its minting.

*Conclusion*

There is no question that the Bible and its contents pervade American secular society. From place names like Goshen and San Jose to given names like Moses and Jesus, one meets the pages of the Bible every day in American life. When anyone refers to a "labor of love", "a thorn in the flesh" or "the fat of the land", the King James Version gives another breath to American life [17] The same is true for the moral values embedded in many of the Ten Commandments that have found their way into statute books. All of this is unsurprising given that, as Justice Douglas put it in *Zorach v. Clauson,* 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954 (1952), "We are a religious people whose institutions presuppose a Supreme Being." [18] Half a century later, Justice Douglas's words con-

---

**16.** As defendants' Catholicism expert, Fr. Francis X. Meehan, admitted, the prevailing English translation in Catholic churches in 1920 was the Douay–Reims Version. *See also ODCC* at 169 ("Both NT and OT [of Douay–Reims] were translated from the Vulgate, in acc. with the Council of Trent's endorsements of this version").

**17.** It is hard to overstate the profound impact of the Authorized Version on law and society in America. For a recent consideration of

that impact, *see* Benson Bobrick, *Wide as the Waters* (2001).

**18.** In this regard, Alexis de Tocqueville's words in *Democracy in America* have particular resonance: "Despotism may be able to do without faith, but freedom cannot. Religion is much more needed in the republic . . . than in the monarchy . . ., and in democratic republics most of all." *Democracy in America* 294 (Anchor Books ed.1969).

tinue to state a cultural as well as an historical fact.

This pervasive reality, however, is not a short answer to the objections plaintiffs have raised here. We cannot pretend that the tablet's words do not mean what they say, or forget the sincere religious impulse of both the donors and donees in 1920.

We also cannot forget the pervasive disestablishment of religion in this country. Disestablishment is not a lonely First Amendment redoubt occupied only by some federal judges and a few malcontents. It is in historical fact as American as the free exercise of religion. Disestablishment was accomplished in the states long before the Fourteenth Amendment was held to extend the First Amendment's reach to the states. Indeed, as scholars have noted, Congress's choice of the word "respecting" in the Establishment Clause—and its rejection of "No religion shall be established by law"—assured those several states with established religions that the new Congress was no threat to them.[19] And thus the work of disestablishing those churches occurred state by state, with Massachusetts the last in 1833, without any federal—much less federal judicial—compulsion.[20] As far as the federal courts were concerned, the contrary was

true. *See Trustees of Dartmouth College v. Woodward,* 17 U.S. 518, 4 Wheat. 518, 4 L.Ed. 629 (1819).[21]

The tablet displayed alone outside the Chester County Courthouse, however much an icon it may be to mainline Protestantism and others, thus runs against the strong current of disestablishment in this nation, to which the First Amendment only in recent decades has added its power. Consistent with that tradition and with the Supreme Court's construction of that Amendment, we hold the tablet's presence on the Courthouse to be unconstitutional.

An order granting the relief sought in the Amended Complaint follows.

### JUDGMENT AND ORDER

AND NOW, this 6th day of March, 2002, upon consideration of the evidence and argument presented at the non-jury trial of this matter, and upon the findings of fact and conclusions of law set forth in the accompanying Memorandum, it is hereby ORDERED that:

1. JUDGMENT IS ENTERED for all plaintiffs and against all defendants;

2. This Court DECLARES that defendants' maintenance of their Ten Commandments plaque on the Chester County

---

**19.** McConnell, *supra,* at 23. *See also* Michael J. Malbin, *Religion and Politics* 3–17 (1978) and Robert L. Cord, *Separation of Church and State: Historical Fact and Current Fiction* 7–15 (1982).

**20.** *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion,* 103 Harv. L.Rev. 1409, 1436–1439 (1990). Interestingly, the three states of this Circuit were among the four (Rhode Island being the fourth) that had no established church before the Revolution. *Id.* at 1436.

**21.** Dartmouth was founded by the Rev. Eleazar Wheelock in 1754 as "a charity-school for the instruction of Indians in the Christian religion". *Id.* at 657. Dr. Wheelock ulti-

mately obtained a royal charter that appointed trustees, among them the Earl of Dartmouth. What eventually became the college had as its purpose "the propagation of the Christian religion among the Indians and for the promotion of piety and learning generally." *Id.* at 658. By Acts of the New Hampshire legislature of June 27 and December 18, 1816, the State of New Hampshire in effect sought to disestablish the religious orientation of the school. As is well known, the Supreme Court held those acts of the New Hampshire legislature unconstitutional under the Contract Clause of Art. I § 10 cl. 2 ("No State shall ... pass any ... Law impairing the Obligation of Contracts"). The First Amendment was not mentioned in Chief Justice Marshall's opinion.

Courthouse facade violates the First Amendment, incorporated through the Fourteenth Amendment, of the United States Constitution;

3. Defendants are hereby PERMA-NENTLY ENJOINED from continued maintenance of the Ten Commandments plaque on the Chester County Courthouse; and

4. Plaintiffs shall file any petition for attorneys' fees and reimbursement of out-of-pocket expenses at the later of forty days from the date of this Order or ten days after final appellate action.