**FREETHOUGHT SOCIETY et al.,**

v.

**CHESTER COUNTY et al.**

**No. CIV.A. 01–5244.**

United States District Court,
E.D. Pennsylvania.

April 8, 2002.

438

Stefan Presser, American Civil Liberties Union, Philadelphia, PA, for Plaintiff.

Thomas C. Abrahamsen, Solicitor's Office, West Chester, PA, for Defendant.

## MEMORANDUM

DALZELL, District Judge.

On March 6, 2002, after a trial, we declared that defendants' keeping of their Ten Commandments plaque on the Chester County Courthouse facade violated the First Amendment, and permanently enjoined them from continued maintenance of that plaque. *See Freethought Society v. Chester County*, 191 F.Supp.2d 589 (E.D.Pa. 2002). Having filed a notice of appeal of that decision, defendants thereafter filed a motion to stay our Order, and plaintiffs have filed their opposition to that motion.

Among other things, the parties joined issue on the factual question of irreparability of harm. We therefore held a hearing on that point, and heard argument, earlier today.[1]

*Governing Standard*

A disappointed litigant in an equity case in federal court may seek what the Federal Rules of Civil Procedure describe as an injunction pending appeal. Specifically, Fed.R.Civ.P. 62(c) provides, in relevant part, that "[w]hen an appeal is taken from an interlocutory or final judgment granting ... an injunction, the court in its dis-

---

**1.** The hearing was somewhat delayed after the close of briefing because one of counsel involved here was on trial in another matter. We therefore have had the luxury of being able to reflect on the legal points since March 21, when plaintiffs filed their opposition.

cretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party." Although defendants here have taken the normally jurisdiction-divesting action of filing a notice of appeal to the Court of Appeals, Fed. R.App. P. 8(a)(1)(A) and (C) provides that parties like defendants must first seek relief in the district court.[2]  Rule of Appellate Procedure 8 provides:

(a) **Motion for Stay.**

(1) **Initial Motion in the District Court.** A party must ordinarily move first in the district court for the following relief:

(A) a stay of the judgment or order of a district court pending appeal;

* * *

(C) an order suspending, modifying, restoring, or granting an injunction while an appeal is pending.

Referring to these rules that "govern the power of district courts and courts of appeals to stay an order pending appeal", the Supreme Court in *Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987), established four common factors that regulate the issuance of stays:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* (citations omitted). The "burden of meeting this standard is a heavy one," Wright & Miller, *supra* note 2 at 503–05.

We will now canvass the four *Hilton* factors.

*Balancing of Stay Factors*

1. *Strong Showing of Success on the Merits*

Our March 6, 2002 Memorandum canvassed at length the facts and law that led us to conclude that the continued display of this primarily sectarian statement offends both the First Amendment and the history of disestablishment of which the First Amendment has become the centerpiece in recent decades.

■ Defendants place great stress on what they regard as the likelihood that the Supreme Court will overrule *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Defendants contend that the fulfillment of this prediction will undermine the jurisprudential foundation of our March 6 decision. Putting aside the inherently speculative nature of defendants' prophecy, there is no reason to expect that the Supreme Court will reconsider, much less overrule, *Lemon.*

To be sure, as we pointed out at pages 10–12 of our March 6, 2002 Memorandum, many have heaped ashes on *Lemon*, none more vividly than Justice Scalia in his concurrence in *Lamb's Chapel v. Center Moriches School Dist.*, 508 U.S. 384, 398, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (Scalia, J., concurring). But as we observed on page 12 of our Memorandum, where we quoted the Seventh Circuit's statement in *Books v. City of Elkhart*, 235 F.3d 292, 301

---

**2.** Indeed, Rule 62(c) authority continues "throughout the period when the appeal is pending." *U.S. v. El–O–Pathic Pharmacy,* 192 F.2d 62, 80 (9th Cir.1951) *quoted in* Charles Alan Wright, Arthur Miller, and Mary Kay Kane, 11 *Federal Practice and Procedure* § 2904 at 517 (1995) ("Wright & Miller").

*See also Hoffman v. Beer Drivers & Salesmen's Local Union No. 888,* 536 F.2d 1268, 1276 (9th Cir.1976) ("in the case of an appeal from an order granting an injunction, the district court does not lose jurisdiction to alter the injunction.").

(7th Cir.2000), *cert. denied,* 532 U.S. 1058, 121 S.Ct. 2209, 149 L.Ed.2d 1036 (2001), we are not at liberty to stray from *Lemon* until the Supreme Court explicitly overrules that oft-cited decision.

Such an overruling is not imminent. Indeed, not only has the Supreme Court applied *Lemon*'s test as recently as two years ago, *see Santa Fe Indep. School Dist. v. Doe,* 530 U.S. 290, 314, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000)[3], it declined to review the Seventh Circuit's decision in *Books* over the strong dissent of The Chief Justice and Justices Scalia and Thomas who criticized the Seventh Circuit for "applying the oft-criticized framework set out in *Lemon v. Kurtzman*", 121 S.Ct. at 2211. Just over a month ago, the Supreme Court denied the petition for a writ of *certiorari* in *Indiana Civil Liberties Union, et al. v. O'Bannon,* 259 F.3d 766 (7th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1173, —— L.Ed.2d —— (2002), which proffered another chance to overrule *Lemon* in a Ten Commandments case.

Thus, in the harsh light of actual opportunities to review *Lemon*—even in two cases presenting challenges to Ten Commandments memorials—the Supreme Court has declined to revisit that watershed decision. *Lemon* thus remains good law, and defendants' views to the contrary constitute nothing more than wishful thinking.

Regarding defendants' contention that neither plaintiff has standing, we thoroughly considered this question at pages 7–9 of our March 6 Memorandum. The affidavit Ms. Downey appended to plaintiffs' opposition to the motion to stay merely confirms what we held on March 6, and that is her regular need to visit the Courthouse where she comes into unwelcome contact with the Ten Commandments plaque. Ms. Flynn will, as we held, return at least on an annual basis to the High Street side of the Courthouse to participate in political rallies. If neither of these women has standing to challenge the plaque, it is very hard to imagine who in Chester County would. Indeed, on defendants' reasoning, no one in Chester County would have standing to challenge the mounting of a crucifix on the High Street facade. Nothing in First Amendment standing jurisprudence warrants such an unthinkable result.

There is no point in restating what we discussed at such length regarding the predominant religious purpose of the plaque. Viewing its text, history, and context, the plaque here stands in contrast to other cases where the language of the Ten Commandments was both laundered to remove sectarian origin *and* placed among many other wholly secular memorials. *See* our discussion of defendants' "best case", *State of Colorado v. Freedom From Religion Foundation,* 898 P.2d 1013 (Colo. 1995), at pages 19–21 of our March 6 Memorandum.

In sum[4], had this plaque been displayed next to, say, plaques of the Bill of Rights, the Declaration of Independence and the

---

**3.** Justice Stevens, writing for himself and all other Justices except The Chief Justice and Justices Scalia and Thomas, wrote that "we assess the constitutionality of an enactment by reference to the three factors first articulated in *Lemon v. Kurtzman* ... which guides the general nature of our inquiry in this area." *Id.* (citations and internal quotation marks omitted).

**4.** Defendants' other arguments are unworthy of serious discussion. For example, they take umbrage that we "accepted into evidence and relied on expert witness testimony" regarding the "endorsement" issue. Br. in Sup. of Mot. of Def'ts ("Def'ts' Br.") at 9. As we did no such thing, this statement is fiction. While the King James Version is without question an unequalled treasure of the English language beloved by speakers of many faiths, our references to standard scholarly sources dem-

Mayflower Compact, this might have been a much closer case.[5] As this plaque hangs alone, however, it is not a close case. Far from making a "strong showing" of likely success in their appeal, defendants have shown none.

### 2. Irreparable Injury

■ In defendants' motion, they offer the conjecture that given the plaque's mounting on "brittle" limestone[6], removing it pending appeal could well damage both the wall and the plaque. This possibility is not surprising given the fact that the plaque has been mounted on that limestone for over eighty-one years. Indeed, two witnesses today testified that defendants' fears of significant damage are by no means without foundation.

While Jim Brooks, plaintiffs' registered professional structural engineer, disputes defendants' fear in his affidavit, it would seem that the real possibility of irreparable physical injury here may be cured merely by covering the plaque with an opaque beige drape that is calculated to match the color of the surrounding limestone. Balancing the equities, such a drape will surely suffice during the pendency of appellate review.

### 3. Substantial Injury to Other Parties

■ Others will suffer no substantial injury if the plaque is covered with an opaque beige drape while the appeal is pending. After the extensive notoriety of this case, everyone on both sides of the issue will know what is behind the drape, but none whose views are now constitutionally vindicated will take offense at the actual sight of this sectarian statement.

### 4. The Public Interest

■ The public interest will be served by covering the plaque because, as the Supreme Court noted in *Elrod v. Burns*, 427 U.S. 347, 373–74, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." As Wright & Miller point out, stays are commonly denied in First Amendment cases. *See* Wright & Miller, *supra*, at 507–09, n. 15 (collecting cases). The plaque here has already rebuked the First Amendment for over eighty-one years, and thus its removal from sight on this courthouse (of all places) is long overdue.

In addition to the manifest violation of Establishment Clause jurisprudence we described in our March 6 Memorandum, the plaque is, as we suggested in our Conclusion, alien to the tradition of disestablishment of which the First Amendment is only a part. That tradition has particular force in the Commonwealth of Pennsylvania, where William Penn's "holy experiment" included tolerance of competing religious views that was unique in the colonies long before the First Amendment was a gleam in James Madison's eyes.[7]

onstrated the sectarian nature of this Version of the Bible, *contra* the misreading in Def'ts' Br. at 4–5. *See, e.g.,* notes 5, 9, and 16 of our March 6 Memorandum.

**5.** *Compare Books, supra,* where a Court of Appeals panel divided two to one in invalidating a DeMille Ten Commandments monument next to two secular memorials, 235 F.3d at 295–96, *with Freedom From Religion Foundation, supra,* where the Colorado Supreme Court by a four to three vote upheld a DeMille

memorial amid an assemblage of many other secular monuments, 898 P.2d at 1016.

**6.** "This stone is more brittle than other kinds of stone, e.g., granite." Def'ts' Br. at 1–2.

**7.** As Judge Adams summarized it in his treatise,

The Quaker leader William Penn devoted his life to securing liberty of conscience as a God-given right beyond the dominion of government. Combining the roles of reli-

Balancing all the factors, we will grant a stay, but only upon the condition provided in the accompanying Order.[8]

### ORDER

AND NOW, this 8th day of April, 2002, upon consideration of defendants' motion for a stay pending appeal, plaintiffs' opposition thereto, and after a hearing this day, and upon the findings of fact, conclusions of law and balancing of equities set forth in the accompanying Memorandum, it is hereby ORDERED that:

1. The motion is GRANTED only to the extent of the following paragraph; and

2. By April 22, 2002, defendants shall cover the Ten Commandments plaque on the Chester County Courthouse facade with an opaque drape of a color calculated to match, as closely as possible, the limestone on the High Street facade of the Courthouse.

gious leader and political statesman, Penn expounded his views on religious liberty in numerous tracts. In *The Great Case of Liberty of Conscience* (1671), he stressed that coercion of conscience destroyed authentic religious experience and "directly invade[d] the divine prerogative."
Arlin M. Adams and Charles J. Emmerich, *A Nation Dedicated to Religious Liberty* 6 (1990). Indeed, with such parentage, it is unsurprising that, as Judge Adams has pointed out,
> In line with a rich heritage of religious freedom, the Pennsylvania Declaration of Rights of 1776 prohibited compulsory attendance at or support of worship and provided that "all men have a natural and unalienable right to worship Almighty God according to the dictates of their own consciences."
*Id.* at 9, *quoting* Pa. Const. of 1776, Decl. of Rights, art. II, *quoted in* 5 *The Federal and State Constitutions, Colonial Charters, and Other Organic Laws* 3082 (F. Thorpe ed. 1909).

8. It has been reported that the County Commissioners, in a laudable effort to reconcile the sincere and deeply held opposing views of their constituents, are entertaining options to change the context of the plaque. *See, e.g.,* Apr. 3, 2002 ltr. of Thos. C. Abrahamsen, Esq. to the Court; *see also The Philadelphia Inquirer,* April 3, 2002 at A1 ("Tableau is offered to save tablets"). While we applaud any effort to reach a compromise here, with the disposition of this motion our jurisdiction ends except as to enforcement of the accompanying order and our residual Rule 62(c) authority. *See* note 2, *supra.* Jurisdiction now reposes in the Court of Appeals. These jurisdictional realities need not, however, impede attempts to resolve this important controversy. The parties may avail themselves of the Third Circuit's Appellate Mediation Program, or with leave from the Court of Appeals seek the mediation of the Hon. Jacob P. Hart, who served with great distinction as the first Appellate Mediator and now is our colleague in this Court.