

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-6-2004

# Modrovich v. Allegheny

Precedential or Non-Precedential: Precedential

Docket No. 03-3571

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Modrovich v. Allegheny" (2004). *2004 Decisions.* Paper 176.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/176

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

IN THE UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT
_____

No. 03-3571
_____

ANDY MODROVICH; JAMES
MOORE,

Appellants

v.

ALLEGHENY COUNTY,
PENNSYLVANIA

_____

On Appeal from the United States
District Court
for the Western District of Pennsylvania
District Judge: The Honorable Donetta
W. Ambrose
(Civ. No. 01-cv-00531)

_____

Argued March 24, 2004

Before: FUENTES, SMITH, and

GIBSON,* Circuit Judges.

(Opinion Filed: October 6, 2004)

_____

OPINION OF THE COURT
_____

Ayesha N. Khan
Alex J. Luchenitser (argued)
Americans United for
Separation of Church and State
518 C Street NE
Washington, DC 20002

*Counsel for Appellants*

Perry A. Napolitano (argued)
Donna M. Doblick
P. Gavin Eastgate
Darren P. O'Neill
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219

Ralph A. Finizio
Kevin L. Colosimo
Houston Harbaugh
Two Chatham Center, 12th Floor
Pittsburgh, PA 15219-3463

*Counsel for Appellee*

_____

  * The Honorable John R. Gibson, Senior
Circuit Judge for the United States Court
of Appeals for the Eighth Circuit, sitting
by designation.

Fuentes, <u>Circuit Judge</u>.

This appeal raises the issue of whether the display of a plaque containing the text of the Ten Commandments on the Allegheny County Courthouse violates the Establishment Clause of the First Amendment of the U.S. Constitution. Appellants Andy Modrovich and James Moore seek review of the District Court's decision granting summary judgment in favor of Allegheny County and holding that displaying the plaque does not violate the Establishment Clause. Modrovich and Moore, two avowed atheists, claim to have had regular and unwelcome contact with the plaque while entering and walking past the courthouse. They argue that Allegheny County's continued display of the plaque represents a government endorsement of religion in violation of the Establishment Clause.

In <u>Freethought Society of Greater Philadelphia v. Chester County</u>, 334 F.3d 247 (3d Cir. 2003) [hereinafter "<u>Freethought</u>"], we addressed a similar dispute concerning a plaque of the Ten Commandments affixed to the façade of a courthouse in Chester County, Pennsylvania. We found that a reasonable observer, aware of the history of the 82-year-old plaque, would not have viewed Chester County's refusal to remove the plaque as an endorsement of religion, and that the county had a legitimate secular purpose for continuing to display the plaque. In accordance with our decision in <u>Freethought</u>, we hold that because the Ten Commandments plaque in Allegheny County has been a fixture on an historical courthouse since 1918, is not highlighted or displayed prominently, and is one of several historical relics displayed on the courthouse, Allegheny County's refusal to remove it does not send a message of government endorsement of religion in violation of the Establishment Clause.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In 1918, a bronze plaque containing the text of the Ten Commandments and other biblical passages ("the Plaque") was donated to Allegheny County Pennsylvania ("the County"). The Plaque is now affixed to the stone wall of the Allegheny County Courthouse, facing a main street (Fifth Avenue) in downtown Pittsburgh. Modrovich and Moore alleged that they have had regular, direct and unwelcome contact with the Plaque while entering the courthouse on errands and walking past it on their way to and from work. Modrovich and Moore claim to have felt "affronted and deeply offended" by the display, feeling as though the County views them as outsiders in the community because they do not adhere to the religious message of the Commandments. Complaint at ¶4.

In October 2000, an attorney from the Americans United for Separation of Church and State contacted the then-Chief Executive of Allegheny County (James Roddey) and then-President of the County Council (John DeFazio) on behalf of Modrovich and Moore, requesting that the

2

Plaque be removed because its continued presence violated the Establishment Clause of the First Amendment. County officials disagreed with that assertion and refused to remove the Plaque. In addition, the County Council passed a motion on January 16, 2001, expressing its support for the efforts of Roddey and DeFazio to prevent its removal.

Modrovich and Moore filed suit in the Western District of Pennsylvania on March 27, 2001, pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"). They claimed that their First Amendment rights were being violated under color of state law by a local municipality. They sought a declaratory judgment that the continued presence of the Plaque violated the First and Fourteenth Amendments. They also sought a permanent injunction prohibiting the County from displaying the Plaque at the courthouse. Modrovich and Moore filed a motion for summary judgment and a motion for a permanent injunction on January 31, 2002, arguing that the Plaque had the effect of endorsing religion. The County filed a cross-motion for summary judgment on the same day, asserting that because the Plaque is one of over twenty historical, political, and cultural relics displayed at the courthouse, it has secular significance and its continued display does not amount to an unconstitutional endorsement of religion.

While these motions were pending, the Eastern District of Pennsylvania decided Freethought, a case involving almost identical facts and issues concerning the display of a plaque of the Ten Commandments affixed to a courthouse in Chester County. See Freethought Soc'y v. Chester County, 191 F. Supp. 2d 589 (E.D. Pa. 2002). On March 6, 2002, that court, applying the three-prong test set forth in Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971), found that the plaque was only incidentally secular, and that Chester County officials intended the plaque to advance the Christian religion. The court, therefore, held Chester County's display of the plaque to be unconstitutional under the Establishment Clause. Freethought, 191 F. Supp. 2d at 599. Chester County appealed the district court's decision to this Court. While Freethought was on appeal, the District Court judge in the instant case advised the parties that she would hold their motions for summary judgment in abeyance pending our decision.

On June 26, 2003, this Court, analyzing the constitutionality of the Chester County plaque under both the "Lemon" test and the "endorsement" test, reversed the decision of the district court in Freethought. The endorsement test, a modification of the Lemon test, was first articulated by Justice O'Connor in Lynch v. Donnelly, 465 U.S. 668, 687-88 (1984) (O'Connor, J., concurring). Under both of these approaches, this Court held that the Chester County plaque did not violate the Establishment Clause. Freethought, 334 F.3d at 251. We then vacated the permanent injunction issued by the district court prohibiting Chester County from displaying the plaque.

3

Following this precedent, the District Court in this case granted summary judgment to Allegheny County and denied summary judgment to Modrovich and Moore.

## II. THE LEGAL FRAMEWORK

### A. The Establishment Clause

Under the Establishment Clause of the First Amendment, "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Fourteenth Amendment imposes this limitation on the states as well as their political subdivisions. Wallace v. Jaffree, 472 U.S. 38, 49-50 (1985). The Supreme Court has articulated three separate tests for determining whether governmental action violates the Establishment Clause. The first of these, the "coercion" test, is not applicable to this case. It focuses primarily on government action in public education and examines whether school-sponsored religious activity has a coercive effect on students. See Freiler v. Tangipahoa Parish Bd. of Educ., 185 F.3d 337, 343 (5th Cir. 1999), cert. denied, 530 U.S. 1251 (2000). The second and third tests, however, are both relevant to this case. The second, the "Lemon" test, is a three-prong approach to be used when analyzing government action challenged under the Establishment Clause. Lemon, 403 U.S. at 612-13. Under Lemon, the challenged action is unconstitutional if (1) it lacks a secular purpose, (2) its primary effect either advances or inhibits religion, or (3) it fosters an excessive entanglement of government with religion. Id.

Finally, the "endorsement" test modifies Lemon in cases involving religious displays on government property. The endorsement test dispenses with Lemon's "entanglement" prong and, combining an objective version of Lemon's "purpose" prong[1] with its "effect" prong, asks whether a reasonable observer familiar with the history and context of the display would perceive the display as a government endorsement of religion. Lynch, 465 U.S. at 687 (O'Connor, J., concurring); see also County of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573, 592 (1989) (adopting the endorsement test by a majority of the Court); Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 174 (3d Cir. 2002) (applying the endorsement test to a government display of privately owned and maintained religious objects). The endorsement test asks whether the government action has "the effect of communicating a message of

---

[1] Instead of looking to the legitimacy of the County's articulated purposes, see Edwards v. Aguillard, 482 U.S. 578, 585 (1987) (stating that "[t]he purpose prong of the Lemon test asks whether government's actual purpose is to endorse or disapprove of religion" (quotation omitted)), the purpose inquiry in the endorsement test looks to "what viewers may fairly understand to be the purpose of the display," County of Allegheny v. ACLU, 492 U.S. 573, 595 (1989) (quotation omitted).

4

government endorsement or disapproval of religion." Lynch, 465 U.S. at 692 (O'Connor, J., concurring). The endorsement test centers on the perceptions of the "reasonable observer" when viewing a religious display. Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 778 (1995). Thus, in applying the endorsement test, we do not examine the County's motivations in displaying the Plaque, but consider the Plaque's effect on the reasonable observer, determining whether the reasonable observer would perceive it as an endorsement of religion.

## B. Freethought and the Endorsement Test

In Freethought, we began our analysis of the constitutionality of the Chester County plaque by first considering which test should be applied to determine whether the plaque violated the Establishment Clause. We decided that the correct test was not Lemon (which the district court had applied), but the endorsement test. In arriving at this conclusion, we noted that the Supreme Court had begun to rely increasingly on the endorsement test in recent years and had criticized Lemon as being vague and, consequently, unpredictable in its application. Id. at 256-57 (citing County of Allegheny, 492 U.S. at 631 (O'Connor, J., concurring)); Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 398-99 (1993) (Scalia, J., concurring) (criticizing Lemon); Wallace, 472 U.S. at 108 (Rehnquist, J., dissenting); see also Tenafly, 309 F.3d at 144.

In applying the endorsement test, we identified two factors as particularly critical: first, the message that the "reasonable observer" receives from the display, i.e., whether the display sends a message of government endorsement of religion; and second, the context in which the religious display appears.

[T]he reasonable observer in the endorsement inquiry must be deemed aware of

the history and context of the community and forum in which the religious display

appears. . . . Nor can the knowledge attributed to the reasonable observer be

limited to the information gleaned simply from viewing the challenged display. . . .

[O]ur hypothetical observer also should know the general history of the place in

which the [object] is displayed. . . . An informed member of the community will

know how the public space in question has been used in the past.

Capitol Square, 515 U.S. at 780 (O'Connor, J., concurring in part and concurring in the judgment) (internal citations omitted). Thus, the reasonable observer is presumed to know the general history of both the religious display and the community in which it is erected. The reasonable observer is also "more knowledgeable than the uninformed passerby." Freethought, 334 F.3d at 259.

In addition, every Establishment

Clause challenge requires a fact-specific, case-by-case analysis. See Lynch, 465 U.S. at 678; County of Allegheny, 492 U.S. at 629-30 (O'Connor, J., concurring). This is mainly due to the fact that the particular context in which a basically religious display appears can alter the message of this display such that it is no longer endorsing religion, but merely acknowledging it. See Lynch, 465 U.S. at 692 (O'Connor, J., concurring). Admittedly, the text of the Ten Commandments contains an "inherently religious message." Freethought, 334 F.3d at 262 (citing Stone v. Graham, 449 U.S. 39, 41 (1980)). However, posting the Commandments can still, under certain circumstances, be considered a secular display. In Edwards v. Aguillard, 482 U.S. 578 (1987), the Supreme Court stated that a prior "decision forbidding the posting of the Ten Commandments did not mean that no use could ever be made of the Ten Commandments, or that the Ten Commandments played an exclusively religious role in the history of Western Civilization." Edwards, 482 U.S. at 593-94. Thus, it is well-established that the context in which an otherwise religious display appears can change the reasonable observer's perception of it. See Lynch, 465 U.S. at 692 (O'Connor, J., concurring); County of Allegheny, 492 U.S. at 630 (O'Connor, J., concurring) (stating that the "history and ubiquity" of a government action contributes to the context that affects the reasonable observer's perception of endorsement); see also King v. Richmond County, 331 F.3d 1271 (11th Cir. 2003) (holding that a superior court's official seal depicting two tablets representing the Ten Commandments did not send a message of endorsement because of various contextual factors surrounding the seal's appearance and use).

Accordingly, the Court in Freethought considered various facts concerning the context of the plaque, including its history and age, its status as a long-standing fixture on an historic monument, and the fact that it was displayed by itself. The Court held that "the reasonable observer must certainly be presumed to know that the plaque has been affixed to the Courthouse for a long time," and would therefore view the plaque itself (rather than the text of the Ten Commandments "in the abstract") as a reminder of historical events in Chester County rather than as an endorsement of religion by county officials. Freethought, 334 F.3d at 265. The Court also created a model of the reasonable observer. It found that the reasonable observer in that case would know the approximate age of the plaque, and the fact that Chester County had not moved, maintained or highlighted the plaque since it was erected in 1920. The reasonable observer would also be "aware of the general history of Chester County." Id. at 260.

The Court found that, based on this knowledge, the reasonable observer would conclude that the decision to leave the plaque in place was significantly motivated by a desire to preserve the plaque as an historical artifact. Id. at 265.

Also, a reasonable observer would understand that over time additions to historic buildings such as the courthouse, which is included in the National Register of Historic Places, can become part of the monument and its history. Id. at 266. Considering Chester County's interest in historical preservation, and the reasonable observer's understanding of the plaque's significance to the courthouse's history, we concluded that the county's refusal to remove the plaque did not send a message of endorsing religion. Such a refusal to remove an historical artifact presents a very different scenario than, for example, attempting to install a new monument incorporating the Ten Commandments. Id. at 265. In the latter instance, a reasonable observer is much more likely to conclude that the government is attempting to endorse the religious message contained in the text of the Commandments because no legitimate secular motivation for erecting the monument (such as historic preservation) is apparent.

In addition, Chester County took no steps to highlight or celebrate the plaque or its contents. In fact, the entranceway nearest the plaque had been closed, making its presence less prominent, and supporting a perception that, by leaving the plaque affixed to the façade in its original historical location, Chester County was not attempting to endorse its religious content. Id. at 266-67. "In not changing the location of the plaque to the main entrance or otherwise actively drawing attention to the plaque, Chester County and its Commissioners' conduct indicates neutrality toward the plaque and its text." Id. at 270 (Bright, J., concurring). Thus, the Freethought Court held that the reasonable observer would not believe that Chester County commissioners were attempting to endorse religion by refusing to remove the plaque.

## C. Application of the Lemon Test in Freethought

Although the Court decided the case under the endorsement test, it also applied the Lemon test, as the Supreme Court could still potentially review the issue under Lemon. Id. at 250. We disagreed with the district court's analysis under Lemon insofar as it gave relatively little weight to the actions and viewpoints of the current Chester County commissioners who declined to remove the plaque, instead focusing primarily on the motivations of the 1920 county officials who accepted the plaque. Freethought, 334 F.3d at 267. Thus, we concluded that the relevant government action was the decision not to remove the plaque, and, in examining the government's motivations, that courts should consider both time periods with the primary emphasis on recent events. It would have made little sense to attempt to analyze the allegedly offensive effect of the plaque on current Chester County residents, while only examining the original purpose for erecting it. See id.

Considering the purpose prong of Lemon, the Court found that Chester County had expressed a legitimate secular purpose for refusing to remove the plaque

7

(i.e., a desire to retain an historical element of an historical building). As the Court noted, the proffered reason for the decision need not be "exclusively secular," and the purpose prong only requires the reviewing court to find that the articulated secular purpose is not a "sham." Id. at 267 (citing Edwards, 482 U.S. at 585-87). Thus, the Court accepted Chester County's reason, citing testimony from Chester County commissioners expressing their views of the plaque as having historical and secular, as well as religious, significance. Id. Chester County also supported these views with case law and legal treatises suggesting that the Ten Commandments "have an independent secular meaning in our society because they are regarded as a significant basis of American law and the American polity." Id. While the Court did not specifically consider the Lemon question of whether the primary effect of retaining the plaque was to advance or inhibit religion, it held that question to be encompassed in its endorsement test analysis and, therefore, concluded that Chester County's refusal to remove the plaque was constitutional under both the purpose and effect prongs of Lemon. Additionally, the Court noted that Lemon's entanglement prong was an aspect of the effect inquiry and, as such, was also encompassed by its endorsement test analysis. Id. at 258 (citing Agostini v. Felton, 521 U.S. 203, 233 (1997)).

## III. DISCUSSION

**A. Description of the Allegheny Plaque**

The Allegheny County Courthouse occupies a full city block in downtown Pittsburgh. It borders on four main roads (Grant Street, Fifth Avenue, Ross Street, and Forbes Avenue), and is built around an interior courtyard. The Courthouse complex was designed by world-renowned architect Henry Hobson Richardson and was completed in 1888. In 1968, the Pittsburgh History and Landmark Foundation designated the Courthouse an historical landmark. On March 7, 1973, it was placed on the National Register of Historic Places, and on May 11, 1976, it was named a National Historical Landmark.

The Plaque, a bronze tablet entitled "THE COMMANDMENTS," is four feet high by three feet wide. It displays the text of the Ten Commandments, largely from the King James version of Exodus and Deuteronomy. It reads:

THOU SHALT HAVE NO OTHER GODS BEFORE ME.

THOU SHALT NOT MAKE UNTO THEE ANY GRAVEN IMAGE, OR ANY LIKENESS OF ANY THING THAT IS IN HEAVEN ABOVE, OR THAT IS IN THE EARTH BENEATH, OR THAT IS IN THE WATER UNDER THE EARTH: THOUGH SHALT NOT BOW DOWN THYSELF TO THEM, NOR SERVE THEM:

FOR I THE LORD THY GOD AM A JEALOUS GOD, VISITING THE

INIQUITY OF THE FATHERS UPON THE CHILDREN UNTO THE THIRD AND FOURTH GENERATION OF THEM THAT HATE ME; AND SHEWING MERCY UNTO THOUSANDS OF THEM THAT LOVE ME, AND KEEP MY COMMANDMENTS.

THOU SHALT NOT TAKE THE NAME OF THE LORD THY GOD IN VAIN:

FOR THE LORD WILL NOT HOLD HIM GUILTLESS THAT TAKETH HIS NAME IN VAIN.

REMEMBER THE SABBATH DAY, TO KEEP IT HOLY. SIX DAYS SHALT THOU LABOR AND DO ALL THY WORK: BUT THE SEVENTH DAY IS THE SABBATH OF THE LORD THY GOD: IN IT THOU SHALT NOT DO ANY WORK, THOU, NOR THY SON, NOR THY DAUGHTER, THY MANSERVANT, NOR THY MAIDSERVANT, NOR THY CATTLE, NOR THY STRANGER THAT IS WITHIN THY GATES:

FOR IN SIX DAYS THE LORD MADE HEAVEN AND EARTH, THE SEA, AND ALL THAT IN THEM IS, AND RESTED THE SEVENTH DAY: WHEREFORE THE LORD BLESSED THE SABBATH DAY, AND HALLOWED IT.

HONOR THY FATHER AND THY MOTHER:

THAT THY DAYS MAY BE LONG UPON THE LAND WHICH THE LORD THY GOD GIVETH

THEE.

THOU SHALT NOT KILL.

THOU SHALT NOT COMMIT ADULTERY.

THOU SHALT NOT STEAL.

THOU SHALT NOT BEAR FALSE WITNESS AGAINST THY NEIGHBOUR.

THOU SHALT NOT COVET THY NEIGHBOUR'S HOUSE. THOU SHALT NOT COVET THY NEIGHBOUR'S WIFE, NOR HIS MANSERVANT, NOR HIS MAIDSERVANT, NOR HIS OX, NOR HIS ASS, NOR ANY THING THAT IS THY NEIGHBOUR'S.

Below the Commandments is additional language from the Book of Matthew in the New Testament. It is headed "SUMMARY," and reads:

THOU SHALT LOVE THE LORD THY GOD WITH ALL THINE HEART, AND WITH ALL THY SOUL AND WITH ALL THY MIND.

THOU SHALT LOVE THY NEIGHBOUR AS THYSELF.

The Plaque was a gift to the County in 1918 from a religious organization, the

International Reform Bureau, which was a Christian lobby whose mission was to introduce religious principles into public life. At the bottom of the Plaque, in smaller type, is a phrase noting that it was donated by this organization. At the Plaque's dedication ceremony in 1918, Judge John D. Shafer stated that, in accepting the Plaque, the County was recognizing the role of the Commandments in the formation of our laws and the sacrifices made in World War I. See County Br. at 4.

The Plaque hangs on a rounded wall that forms part of the entrance to the interior courtyard of the courthouse. It hangs on the Fifth Avenue side of the courthouse at approximately eye-level. On the opposite wall of the courtyard entrance is a plaque of about the same size commemorating an 18th century Polish trader, Anthony Sadowski. App. at 685-713. A public sidewalk is immediately adjacent to the walls, with metal chains separating pedestrians from the plaques. A passerby could easily read the Plaque as he approaches it. Someone walking on the other side of Fifth Avenue could see the Plaque, but would probably not be able to read its contents. In the same vicinity are administrative signs (pertaining to parking and other courthouse information). Located on the other exterior facades of the courthouse, courtyard walls and arched passages leading into the courtyard are plaques commemorating various historic events, people and organizations, for example, a victory during the French and Indian War, a Civil War protest, the

Veterans of Foreign Wars association, the County's bicentennial celebration, National P.O.W.-M.I.A. Recognition Day, the Pledge of Allegiance, and memorials for private individuals. Id. at 685-713, 158-63. Above the Grand Staircase of the courthouse, there is a mural depicting the Goddess of Justice and an etching referring to the courthouse as a "Temple of Justice." Id. at 608. Other plaques also note aspects of the County's history, such as a tablet commemorating William Pitt, for whom the City of Pittsburgh was named, and markers describing the formation of the County and the origins of Pittsburgh. Three other plaques note the courthouse's inclusion in city, state, and national historical landmark registers. Id. at 685-713. The Plaque was originally affixed to the main façade of the courthouse (on Grant Street), but was moved to its present location sometime before May 11, 1976, when it was entered into the registry of National Historical Landmarks. Neither party to this case has suggested a reason for this move. See Dist. Ct. Op. at 43.

Given the fact-specific inquiry required under both the endorsement test and the Lemon test, and the District Court's finding that this case is indistinguishable from Freethought, the factual similarities between the display of the Plaque in this case and the Chester County display are crucial to our decision. We, therefore, provide a description of the Chester County plaque. As in this case, the Chester County plaque was affixed to the exterior wall of the county courthouse,

10

which was listed in the National Register of Historic Places. The plaque was a gift from an organization known as the Religious Education Council. Chester County commissioners accepted the plaque in 1920 in a public dedication ceremony described as having both secular and religious overtones. The Chester County plaque measures 50 inches tall by 39 inches wide (approximately the same size as the Plaque in the instant case) and contains text from the Old and New Testaments identical to that of the Plaque on the Allegheny courthouse. The Chester County plaque was hung near the original main entrance to the Chester County courthouse. In order for someone passing by to read any text other than the heading on the plaque, it would be necessary to climb the steps leading to the original entrance, which was closed in 2001. In addition to the plaque, the side of the Chester County courthouse on which it hangs contains several signs providing administrative information. Also on that façade are plaques noting the courthouse's inclusion in registers of county and national historic places. Unlike in this case, there are no other plaques containing historical, political, or philosophical images or messages on the same side of the building where the Chester County plaque hangs. However, other areas of the courthouse contain displays, including monuments to World War II and Civil War veterans, an historic Chester County marker, and a plaque with an historical description of the original courthouse that stood on the site. Freethought, 334 F.3d at 251-54.

## B. Application of the Tests

Following our reasoning in Freethought, although we find the endorsement test to be the appropriate standard by which to scrutinize the Plaque, we will apply both the endorsement test and the Lemon test, in case a higher court prefers to apply the traditional Lemon test. See Freethought, 334 F.3d at 261.

### 1. The Endorsement Test

It is important as an initial matter to describe the knowledge that we believe is attributable to the reasonable observer in this case. We base this description on the model for the reasonable observer set forth by Justice O'Connor in County of Allegheny, and later applied by this Circuit in Freethought.[2]

---

[2] Accordingly, the subjective feelings expressed by Modrovich and Moore of having been "offended" by the sight of the Plaque on the courthouse are not relevant to the endorsement analysis. "[W]e do not ask whether there is any person who could find an endorsement of religion, whether some people may be offended by the display, or whether some reasonable person might think [the State] endorses religion." Capitol Square, 515 U.S. at 780 (O'Connor, J., concurring) (internal citations omitted) (emphasis and alterations in original). Rather, the endorsement analysis requires a specific, fact-based inquiry to determine if a reasonable observer, aware of various

Bearing in mind that the reasonable observer is an informed citizen who is more knowledgeable than the average passerby, the reasonable observer is deemed to know the history of the Allegheny Plaque, the general history of Allegheny County, and the fact that the Plaque has been affixed to the courthouse for many years. Id. at 259, 260, 265-66. With this knowledge base, the observer can glean other relevant facts about the Plaque and its history from viewing it and its surrounding context. The reasonable observer is aware that the Plaque is one of approximately twenty other historical and cultural displays erected in the courthouse over the past hundred years and that it is not given any preferential treatment over other displays. Although Allegheny County moved the Plaque at one point, the observer would recognize that it has not taken steps to maintain or restore it. Id. at 260. The reasonable observer is also deemed to know the history of the courthouse, its architectural significance, and its place on three state and national registers for historic landmarks. These presumptions are not unreasonable as such historical facts are actually commemorated on the courthouse walls in plaques and

contextual factors, would be offended for the particular reason that the Plaque sends a message of government endorsement of religion. Here, we found that the reasonable observer would not view Allegheny County's retention of the Plaque as government endorsement, but as an effort to preserve an historical relic.

tablets hung alongside the Ten Commandments Plaque. As Freethought noted, "[a] reasonable observer must be presumed to know the history of the Courthouse," particularly since "a marker noting the historic nature of the Courthouse is actually affixed to the same east façade to which the Ten Commandments plaque is affixed." Id. at 266. Further, the circumstances surrounding the Plaque's donation and acceptance, including the secular motivations for its acceptance articulated by Judge Shafer on behalf of the County in 1918, are a matter of public record. See App. at 674 (citing *Speakers Discuss War at Tablet Dedication*, THE GAZETTE TIMES, Apr. 9, 1918, at 11-18). Thus, the reasonable observer is aware that, although the Plaque was donated by a religious organization, the County expressed secular reasons for accepting it given the social conditions at the time (i.e., wartime). We note that the District Court set forth a substantially similar description of the reasonable observer in this case and that Modrovich and Moore do not contest it here. See Dist. Ct. Op. at 33.

Still, Modrovich and Moore point out various context-related factors concerning the Allegheny Plaque that, they argue, would lead the reasonable observer to perceive an endorsement of religion by Allegheny County. Modrovich and Moore attempt to distinguish this case from Freethought, first arguing that the Plaque is displayed more prominently than the Chester County plaque. They contend that

"[s]everal hundred people walk by the Allegheny Plaque, and dozens go into the Courthouse archway entrance near it, during a typical ninety-minute period on a regular business morning." Appellant Br. at 47. It is true that the Chester County plaque is in an unobtrusive location, next to an entrance that has been permanently closed, and that it is not legible from the sidewalk. However, we do not agree that the Allegheny Plaque is displayed any more prominently than the Chester County plaque. It does not hang in any pre-eminent place, but is affixed to a side entrance on Fifth Avenue (as opposed to the main courthouse entrance on Grant Street). The Plaque is not protected from the weather and hangs at street level, unprotected from potential vandalism. See Dist. Ct. Op. at 35. The Allegheny Plaque is no larger than the Chester Plaque, and in neither case can the text be viewed from across the street. In both cases, the text can be read when walking immediately past the plaque, with the only difference being that pedestrians are less likely to pass the Chester Plaque because it hangs at the top of a staircase near a closed entrance. We do not find this minor difference in the placement of the plaques to distinguish the cases. Even if one were to concede that the Allegheny Plaque is in a slightly more prominent location, the Allegheny Plaque's location is certainly not prominent enough to send a message to the reasonable observer that the County is endorsing religion. This is particularly true considering the other contextual factors that must be examined in addition to location under the endorsement test, including the Plaque's age, its history, and the fact that it is one of several historical plaques displayed at the courthouse.

Modrovich and Moore cite the Supreme Court's decision in County of Allegheny, 492 U.S. at 599-600, and this Court's decision in ACLU of N.J. v. Schundler, 104 F.3d 1435, 1446 (3d Cir. 1997), to argue that the prominence of a religious display is a factor weighing against allowing the display. While, as discussed above, prominence is indeed a factor in the endorsement analysis, the facts of these cases support our view that the Allegheny Plaque was not in an especially prominent location. In Schundler, the display at issue was a 12 by 18 foot nativity scene located on the front lawn of City Hall in Jersey City, New Jersey. As the Court noted, the "[c]ity placed the display such that all visitors to City Hall were confronted with prominent religious symbols." 104 F.3d at 1446. Similarly, in County of Allegheny, a nativity scene was placed on the Grand Staircase of the county courthouse. The Grand Staircase was described as the "main," "most beautiful," and "most public" part of the courthouse, and the nativity "occupied a substantial amount of space" on the staircase. 492 U.S. at 580. In comparison, the location of the Allegheny Plaque could not be considered prominent. It does not hang in a main part of the courthouse and, as it is at a side entrance, would never be viewed by all visitors to the courthouse as the displays in Schundler and County of Allegheny were.

13

Modrovich and Moore go on to assert that, unlike in Chester County, Allegheny County officials have taken actions to highlight the Plaque. In Chester County, officials had done nothing to call attention to the plaque (or taken any action whatsoever with respect to the plaque) since it was erected. In contrast, Modrovich and Moore suggest that Allegheny County's moving the Plaque from the Grant Street side of the courthouse to its current location was an effort to call attention to it because "[t]he County could have placed the Plaque in an obscure location after a reason to move it arose, but instead the County relocated the Plaque to the prominent place where it is now." Appellant Br. at 49. We disagree with the assertion that moving the Plaque shows an effort to make its presence more prominent. Neither party offers an explanation as to why it was moved. There is no evidence in the record that the County made the move because it considered the Fifth Avenue entrance more prominent than the Grant Street entrance. Dist. Ct. Op. at 43. In fact, the Plaque's current location near a side entrance is less prominent than its previous location near the courthouse's main entrance. Furthermore, the fact that the Plaque was only moved once in nearly one hundred years supports our view that the County has made no special efforts to highlight or celebrate it. The County has not even taken action to maintain the Plaque, having neither made any effort nor expended any funds to repair, clean or polish it since 1918. Chester County showed similar inaction towards its plaque. "The fact that

[Chester] County has not taken any action to highlight or celebrate the plaque since it was installed reinforces the view of the reasonable observer that the County Commissioners maintained the plaque to preserve a longstanding plaque" rather than endorse the religious message of its text. Freethought, 334 F.3d at 267. Furthermore, Chester County showed a neutral attitude toward the plaque by "not changing the location of the plaque to the main entrance *or otherwise actively drawing attention to the plaque.*" Id. at 270 (Bright, J., concurring) (emphasis added). Similarly, we believe that Allegheny County did nothing to actively draw attention to the Plaque.

Modrovich and Moore also attempt to distinguish this case from Freethought by pointing out that the Chester County courthouse had no plaques on its exterior walls, other than the Commandments plaque, that had "any substantive historical, political, or philosophical content." Appellant Br. at 52. As described above, the Allegheny courthouse displayed several commemorative plaques. Modrovich and Moore argue that these displays would lead a reasonable observer to conclude that the County endorses the substantive content of each of the plaques because each one contains a specific message honoring an event, person, place or text. Appellant Br. at 53. However, as discussed above, the reasonable observer is aware of the one hundred year history of the courthouse and the fact that a wide variety of events, people and philosophical tenets has been commemorated during that

14

time through displays on its walls. As the County points out, "the reasonable observer would no more believe that [it] has endorsed the Old Testament by displaying the Plaque than he or she would believe that the County has endorsed the pantheistic religions of ancient Greece and Rome by displaying the mural of Lady Justice in the Grand Staircase." County Br. at 38.

The fact that the Chester County courthouse lacks similar displays is a weak ground on which to attempt to distinguish this case from Freethought. This is particularly true since the context of a religious display can alter the display's message such that a reasonable observer would not perceive it as endorsing religion. See Lynch 465 U.S. at 692 (O'Connor, J., concurring) (stating that "a typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content"). Following this reasoning, we held that a religious display is more likely to be perceived as an endorsement of religion "where there is nothing else in the context of the display that would change the views of the reasonable observer." Freethought, 334 F.3d at 265. As an example of such a context, we cited "the frieze in the courtroom of the U.S. Supreme Court, which portrays Moses carrying the Ten Commandments alongside depictions of other figures who have impacted modern law, such as John Marshall, William Blackstone, and Caesar Augustus." Id. (citing County of Allegheny, 492 U.S. at

652-53). Further, the Freethought Court held that, even though the Chester County courthouse did not contain several other displays, the plaque's age and history alone provided sufficient context to prevent the reasonable observer from viewing an otherwise religious plaque as an endorsement of religion. Id. at 264. Thus, Freethought found that, *despite* the absence of additional secular displays, the Chester County plaque had a non-religious context because of its age and history. Under this reasoning, the perception that the Allegheny Plaque does not endorse religion is only strengthened by the existence of other displays on the courthouse, in addition to the Plaque's age and history.

Modrovich and Moore also contend that the inscription on the Plaque showing the name of the group that donated it distinguishes it from the Chester County plaque because this group was a "radical religious organization" and, although the Chester County plaque was also donated by a religious organization, the Chester County plaque did not contain an inscription naming its donor. Appellant Br. at 53. Modrovich and Moore assert that a reasonable observer, knowing the Plaque was donated by this Christian group, would have more reason to view the continued display of the Plaque as a government endorsement of religion. We disagree with this assertion. First, the primary focus under both the endorsement and Lemon tests is the events of the time at which the County refused to remove the Plaque rather than the events of 1918 when

15

the display was erected. Freethought, 334 F.3d at 267. Arguing that the inscription establishes the County's endorsement improperly places the focus on the events of 1918, rather than on present events and the County's secular motivations for retaining the Plaque. Furthermore, the reasonable observer, aware of the Plaque's history, would be presumed to know the identity of the Plaque's donor (or at least that the donor was a religious organization) with or without an inscription specifically naming it. This is particularly true here since the circumstances surrounding the Plaque's donation are a matter of public record. Thus, this case cannot be distinguished from Freethought on the basis of an inscription on the Allegheny Plaque.

Our country's interests in historical preservation and recognizing the roots of modern law present secular goals that strongly weigh against compelling the removal of the Plaque even though its content is religious. Considering, from a practical standpoint, the remedy sought by Modrovich and Moore (removal of the Plaque), we should not be swayed by parties' subjective feelings of affront or insult at the sight of a religious display when, as here, the facts surrounding the display do not support a finding of unconstitutional endorsement by the government. Given our national interest in historical preservation, we believe we would set a dangerous precedent if we were to hold that any relic containing a religious message should be removed merely because "*any* person . . . could find

an endorsement of religion" or "*some* people may be offended" by it. Capitol Square, 515 U.S. at 780 (O'Connor, J., concurring) (internal citations omitted) (emphasis and alterations in original). Our country's history is steeped in religious traditions. The fact that government buildings continue to preserve artifacts of that history does not mean that they necessarily support or endorse the particular messages contained in those artifacts.

### 2. The Lemon Test

The purpose prong of the Lemon test is discussed below. As explained, this prong simply requires that the County articulate some legitimate secular purpose for refusing to remove the Plaque. See Freethought, 334 F.3d at 267. Examining the motivations behind the decision, we are only required to find that the legitimate secular purpose articulated by the County for retaining the Plaque is not a "sham." Edwards, 482 U.S. at 585-87. As Freethought noted, this is a "low threshold," and courts are generally deferential to the government's proffered secular purpose as long as it is legitimate. 334 F.3d at 267 (citing Edwards, 482 U.S. at 585-87).

In making their argument under the endorsement test, Modrovich and Moore point out various statements made by Allegheny County officials that they claim to show endorsement of religion.

16

However, this evidence of the County's purpose in refusing to remove the Plaque more properly goes to the purpose prong of Lemon. They cite, for example, a deposition statement by Chief County Executive Roddey that "the [P]laque, itself, represents an ethic and a standard for society that I believe that the people of this community would generally agree to." Appellant Br. at 49. They also argue that the statements of various County officials over a broad period of time provide a fuller picture of the County's desire to advance the religious message of the Plaque. For example, Modrovich and Moore cite a public statement made seven years before the commencement of this action by a judge on the Court of Common Pleas of Allegheny County that a lawyer in the County should "go over to the courthouse and read the Ten Commandments and follow them." Id. at 18. Similarly, Modrovich and Moore assert that numerous County residents expressed religious motivations for retaining the Plaque through letters written to County officials in support of its continued display.

In considering the County's purpose, our focus is on the motivations of the current County officials who have power over the decision of whether to remove the Plaque. The ultimate decision-maker here was the then-Chief Executive of Allegheny County, James Roddey. Roddey arrived at his conclusion to retain the Plaque after consulting both the County Solicitor and the President of the County Council. We agree with the District Court's conclusion that the record shows legitimate secular motivations behind Roddey's decision to retain the Plaque. These motivations stem largely from a desire to preserve an historical artifact and from a view of the Commandments as being one of the bases of modern law. As Roddey explained:

The [P]laque was an important part of the heritage and tradition of an historic building; . . . [it] was really a part of the history of the courthouse and we thought it would be inappropriate to take it down. . . . [F]rom what I have read, and what I understand, the people that were responsible for putting up the [P]laque felt that [the Commandments] represented a celebration of the rule of law, and the foundation of the rule of law that was an alternative to war, and other types of national strife.

Roddey Depo. at 14, 20-21. Roddey conceded at his deposition that he had distributed a press release in which he stated his belief that the Ten Commandments represented "a single statement of values, vital to citizens at the crest of the last century and so meaningful to so many at the dawn of this new millennium." Id. at 20-21. However, as he explains this statement: "They [the 1918 County officials] had just come out of . . . World War I. . . . The principle value that I was referring to . . . [w]as just general rules of civilized society." Id. Here, Roddey offers legitimate, secular motivations for his decision. These

17

motivations are based in historical preservation and in a recognition of the role of the Commandments in both Allegheny County history and American law. Even if one did not accept his explanation of the statement in his press release, the purpose of the display need not be exclusively secular. See Edwards, 482 U.S. at 585-87. Even if the Plaque is assumed to incorporate religious meaning or values, the County is not prohibited from displaying such symbols or required to convey only secular messages. The Supreme Court has simply required that the display not be "motivated *wholly* by religious considerations." Lynch, 465 U.S. at 680 (emphasis added).[3]

---

[3] Notwithstanding all of this evidence, the dissent contends that a genuine dispute of fact exists as to whether Roddey's stated secular motivations are sincere or simply a "fig leaf" to cover his religious purposes. See Dissent, p. 5, line 108. However, as noted, the purpose prong of Lemon has a "low threshold," simply requiring a legitimate secular purpose that is not a sham. Freethought, 334 F.3d at 267. We believe that no reasonable jury could find that the historical purpose articulated by Roddey was merely a sham. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). While the dissent may be correct in suggesting that Roddey's motivations are not entirely clear from the record, it is undisputed that he asserted certain secular purposes, and his asserted historical purpose clearly is not a sham, as understood in light of Freethought. 334

Here, Roddey's statements express sufficient secular motivations for his decision. These include the fact that the Plaque is part of the heritage of an historical building, as well as Roddey's belief that the County has an obligation to respect the community's historical decision during World War I to commemorate the value of the rule of law over war. See Roddey Depo. at 20-21 (stating that the County has an "obligation to respect the wishes of the people that [have] gone before us, and the people of the community before us" to "keep the [P]laque as they expected it to be"). Thus, considering that a display need not be motivated by exclusively secular purposes under the Lemon analysis, we find that Roddey's articulations contain sufficient legitimate secular purposes to pass muster. See Lynch, 465 U.S. at 680.

Additionally, we are not convinced that statements made by other County officials (such as the Court of Common Pleas judge) or by other County residents through letters are relevant to the Lemon purpose analysis. None of these individuals was the decision-maker for the County with respect to the Plaque. Therefore, their motivations are not

---

F.3d at 262 (concluding that "the articulation of a legitimate secular purpose for declining to remove the plaque in 2001 would satisfy the first prong of Lemon" (emphasis added)).

relevant to the inquiry.[4] In our view, the record in this case contains sufficient evidence that Allegheny County retained the Plaque for the secular reasons of historic preservation and commemoration of the rule of law, rather than solely for the religious reasons voiced by some members of the community.

The effect and entanglement prongs of Lemon are encompassed by the endorsement test, and, accordingly, we incorporate our earlier discussion of the endorsement test. See Freethought, 334 F.3d at 269. Thus, we hold that the County's refusal to remove the Plaque does not violate either the endorsement test, as discussed in Part III.B.1, or the Lemon test.

## IV. OTHER CIRCUIT COURT CASES

Several other Courts of Appeal have recently considered the issue of whether displays of the Ten Commandments on government property violate the Establishment Clause. At least two of these decisions, from the Fifth and Eleventh Circuits, support our holding here. In Van Orden v. Perry, 351 F.3d 173 (5th Cir. 2003), the Fifth Circuit held that a Ten Commandments monument on Texas state capitol grounds did not endorse religion where the capitol grounds contained many monuments and displays pertaining to the history of Texas. These displays included, for example, an Aztec religious symbol, a Confederate plaque, a plaque commemorating the war with Mexico, and a tribute to African American legislators. The Court held that the Ten Commandments monument did not have a primary effect of advancing or inhibiting religion, as seen from the eyes of a reasonable observer, because the grounds were designated as a National Historical Landmark and contained seventeen monuments depicting symbols of Texan identity. Id. at 175-76. In addition, the monument's location between the Texas Supreme Court building and the capitol building was chosen to reflect the Commandments' role in the making of law. Id. at 181.

Similarly, in King v. Richmond County, the Eleventh Circuit held that a superior court's official seal depicting two tablets representing the Ten Commandments did not send a message of endorsement because of various contextual factors surrounding the seal's appearance and use. 331 F.3d at 1286. These included the fact that the seal had been used by the court for over 130 years for secular, legal documentation purposes. Other relevant contextual factors included the seal's relatively small size, the absence of text on the tablets (although they did contain Roman numerals I through X, clearly representing the Commandments), and the fact that the seal depicted a sword (a symbol of secular law) intertwined with the tablets. Id. at 1283-84. Thus, this

---

[4] In addition, the record shows that most of the correspondence from County residents was actually received after Roddey's decision was made. Roddey Depo. at 71.

decision supports our standpoint that the overall context of a basically religious depiction can affect whether a reasonable observer perceives the display as endorsing religion.

Other Circuits have held that postings of the Ten Commandments violate the Establishment Clause. However, each of these decisions is distinguishable from the instant case and is, therefore, neither persuasive nor apposite. In <u>ACLU of Ohio Foundation, Inc. v. Ashbrook</u>, 375 F.3d 484 (6th Cir. 2004), the Sixth Circuit held that an Ohio Common Pleas Court judge violated the Establishment Clause by displaying a framed poster of the Ten Commandments, which he created himself on his computer, in his courtroom across from a similarly styled framed poster of the Bill of Rights, which he also created. This case is distinguishable from the instant case as it involves a new display rather than an historical artifact.

In another distinguishable case, <u>ACLU of Kentucky v. McCreary County</u>, 354 F.3d 438 (6th Cir. 2003), the Sixth Circuit held that a courthouse's posting of the Ten Commandments, hung in a museum-like setting with other postings designed to display the foundations of American law, violated the Establishment Clause. The Court held that, despite the secular context, the text of the Ten Commandments sent the message of endorsing religion because the county did not make clear in the display that it was attempting to create an exhibit concerning the origins of law. <u>Id.</u> at 448-49. Again,

however, this was a new display, not an historical monument and, therefore, this decision has no persuasive effect on our holding here.

In <u>Adland v. Russ</u>, 307 F.3d 471 (6th Cir. 2002), <u>cert.</u> <u>denied</u>, 538 U.S. 999 (2003), the Sixth Circuit held that a monument displaying a "nonsectarian" version of the Ten Commandments, donated in 1971 but moved to storage in 1980, could not be placed on the state capitol grounds. Once again, this case involved a new placement, not a refusal to remove a longstanding plaque. Additionally, the proposed display in <u>Adland</u> would have been in a prominent location on state capitol grounds, unlike the Allegheny Plaque, which hangs discretely on the side of the courthouse. <u>Books v. City of Elkhart</u>, 235 F.3d 292 (7th Cir. 2000), <u>cert.</u> <u>denied</u>, 532 U.S. 1058 (2001), involved a monument similar to that in <u>Adland</u> in that it also displayed a nonsectarian version of the Commandments and was placed on the lawn in front of a local municipal building. The Seventh Circuit found this display to violate the Establishment Clause, but this decision does not influence our holding here for the same reasons that <u>Adland</u> is unpersuasive. <u>See also</u> <u>Ind. Civil Liberties Union v. O'Bannon</u>, 259 F.3d 766 (7th Cir. 2001), <u>cert.</u> <u>denied</u>, 534 U.S. 1162 (2002) (following <u>Elkhart</u> and holding that the state's intention to erect a monument depicting the Ten Commandments on the park-like grounds of the statehouse would violate the Establishment Clause).

Finally, in <u>ACLU Nebraska</u>

Foundation v. City of Plattsmouth, 358 F.3d 1020 (8th Cir. 2004), the Eighth Circuit held that the city's display of a Ten Commandments monument in a public park since 1965 amounted to unconstitutional government endorsement. This case also addresses a relatively new monument, not an historical relic. Further, the Plattsmouth monument stands alone in a city park. It therefore lacks the kind of historical context that we believe makes the reasonable observer unlikely to perceive the Allegheny Plaque as an endorsement of religion.[5]

The Eleventh Circuit also reiterated the importance of context in

Glassroth v. Moore, 335 F.3d 1282 (11th Cir. 2003), in which it held that a two-and-one-half ton monument of the Ten Commandments, placed in the rotunda of an Alabama State Courthouse by the Chief Justice of the Alabama Supreme Court, violated the Establishment Clause. As with the cases above, this case involved a new and far more prominent display than the Allegheny Plaque. Further, the Eleventh Circuit distinguished Glassroth from its holding in King, a case much more factually similar to the instant case, stating that "he constitutionality of a government's use of a predominantly religious symbol depends on the context in which it appears, and we concluded [in

King] that given the context in which the pictograph of the Ten Commandments appeared on the Seal, a reasonable observer would not believe that the Seal was an endorsement of religion." Id. at 1298-99 (internal citations omitted).

## V. CONCLUSION

For the foregoing reasons, we believe that the Ten Commandments Plaque affixed to the Allegheny County Courthouse does not constitute an endorsement of religion in violation of the Establishment Clause, nor does it violate the test first articulated in Lemon. Thus, the District Court's grant of summary judgment to Allegheny County and denial of summary judgment to Modrovich and Moore will be affirmed.

*Modrovich v. Allegheny County*

No. 03-3571

GIBSON, *Circuit Judge*, dissenting.

I respectfully dissent.

In my view the decision of the district court is based upon factual findings where there is conflicting evidence, particularly with respect to the present intent of County officials. The court followed the teaching of this court's earlier decision in Freethought Society of Greater Philadelphia v. Chester County, 334 F.2d

---

[5] Additionally, we note that Plattsmouth is no longer binding precedent, as the city's petition for rehearing en banc was granted on April 6, 2004.

21

247 (3d Cir. 2003), but overlooks the differing procedural posture of that case. This court in Freethought reviewed a permanent injunction ordering the removal of the Ten Commandments Plaque based on testimony the district court found believable and the legal conclusions based upon these findings. Id. at 255. In contrast, the case before us is an appeal from a grant of summary judgment.

Consistently with the teaching of the Supreme Court, decisions of other circuits, and Federal Rule of Civil Procedure 56, we have stated, "Summary judgment should be granted where no genuine issue of material fact exists for resolution at trial and the moving party is entitled to judgment as a matter of law." Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1362 (3d Cir. 1992). We explained:

> When deciding a motion for summary judgment . . . a court's role remains circumscribed in that it is inappropriate for a court to resolve factual disputes and to make credibility determinations. . . . Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true.

Id. at 1363 (citations omitted). Relying upon Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-251 (1986), we stated that the summary judgment standard has been likened to the "'reasonable jury' directed verdict standard," and "at the summary judgment stage the judge's function is not . . . to weigh the evidence to determine the truth of the matter, but to determine whether there is a genuine issue for trial." Big Apple BMW, 974 F.2d at 1362-63. We concluded:

> In practical terms, if the opponent has exceeded the "mere scintilla" threshold and is offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent's, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the fact finder to ascertain the believablity and weight of the evidence.

Id. at 1363.

The district court, in following Freethought, engaged in weighing of the evidence and fact finding contrary to the teaching of Big Apple BMW and Anderson. The district court based its decision on the conclusion that officials were "sincere" when they articulated secular reasons for keeping the Plaque in

22

place:

> With regard to the current dispute over retention of the Plaque, the reasonable observer would know that the County Executive, Mr. Roddey, with support from County Council, decided to not to [sic] remove the Plaque because he believed it represented "an important part of the heritage and tradition of an historic building" and that the Plaque commemorated the rule of law, as opposed to war.
>
> Based on the cumulative knowledge of the reasonable observer, I find that he or she could not conclude that continued display of the Ten Commandments Plaque reflects an intent by the current county officials to promote or favor one religion over another or indeed even to promote religion over non-religion.

The district court particularly concluded that the County Executive, James Roddey, expressed legitimate, secular reasons for refusing to remove the Plaque, "analogous to those given by the Chester County Commissioners whose explanation had satisfied the 'relatively low threshold required by the purpose prong of Lemon [v. Kurtzman, 403 U.S. 602, 612-13 (1971)],'" citing Freethought, 334 F.3d at 267. The district court continued by observing that Roddey had consulted with the County Solicitor and President of the County Council, and their joint conclusion was that "the plaque was an important part of the heritage and tradition of an historic building; . . . [it] was really a part of the history of the courthouse and we thought it would be inappropriate to take it down." The district court observed that Roddey had conceded at his deposition that he had distributed a press release stating his belief that the Ten Commandments represented a single statement of "values" vital to citizens "at the crest of the last century and so meaningful to many at the dawn of this new millennium." At the same time, the court accepted Roddey's explanation that by "values" he meant that the people that were responsible for putting up the Plaque felt that The Commandments represented a celebration of the rule of law, and the foundation of the rule of law that was an alternative to war, and was "just general rules of civilized society." The district court then stated: "Mr. Roddey's explanations appear to be sincere and consistent with the facts pertaining to the building, its history, the age of the Plaque, and the County's intention to respect the past and preserve the artifacts for future generations."

But the record contains other statements by Roddey that cast a much different light on his motivations. In a

23

press release Roddey stated, "Perhaps the citizens of Allegheny County place a value on the family, on the church and on religion that is vastly different than those who dwell in Washington, D.C. But my heart and my instinct tell me to keep 'The Commandments' and I intend to follow them." Presumably, the reasonable observer reads local newspapers as well as local history books, so this statement has to be entered into the mix in deciding what that observer would think. Furthermore, in his deposition Roddey stated that "the plaque, itself, represents an ethic and a standard for society that I believe the people of this community would generally agree to." This statement could be understood to amount to an adoption of official religious precepts by majority rule, thereby sending a "message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." Freethought, 334 F.3d at 260 (quoting Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 773 (1995)).

And had the reasonable observer attended the Allegheny County Council meeting of January 16, 2001, he or she would have heard the debate when the Council passed a "sense of Council" motion stating, "'The Commandments' reflect values that are important to this community today as they were in the early part of the century." The sponsor of the motion, Vince Gastgeb,[6] stated, "There's values and traditions here in this County that people have fought for, and as elected representatives, we should fight to continue that moving forward." Gastgeb concluded his speech by stating, "We have to have faith." He later stated to the press, "I'd rather see ten religious expressions in the courthouse than none." Another Council member, Richard Olasz, stated during Council debate, "Maybe some of these people that object to [the Plaque] ought to go back and remember that there are no atheists in foxholes, and to remember the old sign on the tombstone: All Dressed Up and Nowhere to Go."

There was also in evidence a statement by the president judge of the Allegheny County Common Pleas Court that in giving an ethics seminar for the County bar association, "I told them to go over to the courthouse and read the Ten Commandments and follow them."

The district court made no reference to an expert's affidavit stating that the text of the Commandments Plaque is a particular Christian Protestant one differing in many ways from that accepted under the Jewish, Roman Catholic, and Lutheran traditions.

There is thus significant record

---

[6]Gasteb said that the sense of Council motion was desirable because the Council has "control over the courthouse," which suggests an unresolved issue as to whether the Council had some authority over the decision to retain the Plaque.

evidence that the decision to keep the Plaque stemmed predominantly from religious impulses and would have been so perceived by a reasonable observer. Even though under the Lemon test, the purpose of the display does not have to be exclusively secular, in this case the evidence would support a finding that the secular purpose was a fig leaf. See Edwards v. Aguillard, 482 U.S. 578, 586-87 (1987) (purpose prong of Lemon requires that assertion of secular purpose be "sincere and not a sham"). Moreover, the statements of religious purpose were made in public in circumstances that may well have given rise to an appearance of endorsement of religion by responsible county officials.

Perhaps the district court simply considered this case to be governed by Freethought.[7] Any such reliance makes even more significant the distinction in the procedural postures between Freethought and this case, for in Freethought we dealt with factual findings made after a hearing in support of an order granting preliminary injunction and here we deal with the far different standard for summary judgment.

A finder of fact could well come to the same conclusion that the district court arrived at. However, the district court was not sitting as finder of fact, but was considering a summary judgment motion. These disputed fact issues should not have been decided as a question of law.[8]

In my view, we should remand for further consideration of the issues in this case.

---

[7]King v. Richmond County, 331 F.3d 1271 (11th Cir. 2003), was recognized by Freethought, but distinguished. 334 F.3d at 263. The county seal of Richmond County depicted a tablet with Roman numerals I-X, but without the text of the Ten Commandments. Because the text was not reproduced, the reasonable observer was therefore not "induced to read or venerate sacred text." Id.

[8]I am aware that this court in Bender v. Williamsport Area Sch. Dist., 741 F.2d 538 (3d Cir. 1984), vacated on other grounds, 475 U.S. 534 (1986), reversed a summary judgment in a school prayer case, but carefully noted there were no material disputes of fact that would preclude consideration of the merits of the case on summary judgment. Id. at 542 n.3.